FILED 24 AUG '11 11:32 USDC-ORE

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

HTI HOLDINGS, INC., an Oregon
corporation,

10-cv-06021-TC

                        Plaintiff,

        v.

AMENDED ORDER AND FINDINGS
AND RECOMMENDATION

HARTFORD CASUALTY INSURANCE
COMPANY, a Delaware corporation,

                        Defendant.

COFFIN, Magistrate Judge:

Defendant Hartford Insurance Company insured plaintiff HTI Holdings, Inc. During the

coverage period, HTI suffered a loss and made a claim. After disagreement about the manner in

which the claim was handled, HTI filed this action alleging breach of contract, negligence, breach

of the implied covenant of good faith and fair dealing and tortious interference with prospective

economic advantage claims. Hartford brought counterclaims for declaratory judgment and breach

of contract. Before me are the parties' cross-motions for partial summary judgement (#'s 115, 118,

Page 1 - ORDER AND FINDINGS AND RECOMMENDATION

139), HTI's motion for summary judgment on Hartford's counterclaims (#119), and HTI's motions

to strike (#'s 162, 164).

### BACKGROUND

HTI manufactured water purification products which utilized a patented "forward osmosis"

system in Linn County, Oregon.  Every year since 1999, HTI had purchased a Spectrum Business

Property Insurance Policy from Hartford.  Among other things, the policy provided unlimited

coverage for business interruption losses for a period of twelve consecutive months following a

covered loss.  At all times relevant to this action, HTI was covered by this policy.

In early 2007, HTI sent a letter to its shareholders reporting a net loss for 2006 and that short

term borrowing exceeded cash and receivables.  The letter reported that the company was in trouble

due to the National Guard's decision not to order its products, but the company expected to generate

between five and seven million dollars in revenue in 2007 due to pushes into the military, disaster

relief, and retail markets.  About a month later, on March 17, 2007,[1] a fire at HTI's manufacturing

plant completely destroyed its production equipment.  HTI made a claim for the loss.  Among the

Hartford employees involved with HTI's claim were: Doug Gilman, the general adjustor; Dorothy

Pawloski, a national adjustor; Patricia Augeri, a home office property adjustor; and Houston Hemp,

Hartford's Assistant Vice President.  Gilman and Pawloski are located in California.  Augeri and

Hemp are based in Connecticut.  Gilman was the primary adjustor assigned to HTI's claim.  He had

direct contact with HTI and hired an accounting firm in Seattle to assist with adjusting HTI's

business interruption claim. The accounting firm reported directly to Gilman, and Gilman made

---

[1]The parties state different dates for the fire: Hartford uses March 20, 2007 (#23 at ¶3);
HTI uses March 17, 2007. (#20 at 3).  The date is not a material fact, however, taking all facts in
a light most favorable to plaintiff, I use HTI's date.

Page 2 - ORDER AND FINDINGS AND RECOMMENDATION

payment recommendations in the file. Gilman did not have any authority to make decisions about payment of HTI's claim. Gilman's supervisor Pawloski reviewed his recommendations and forwarded them to Augeri. Like Gilman, Pawloski did not have any authority to authorize payment on HTI's claim. Augeri had the authority to make decisions on claim payments and to offer suggestions on claims handling on any claim reserved below $1 million. Hemp was responsible for ultimately approving the decisions of his large loss managers, like Augeri. All decisions concerning coverage or the amount of payments to be made on HTI's claim were made by either Augeri or Hemp in Connecticut.

Hartford accepted the claim and eventually paid for HTI's plant to be rebuilt. During the eighteen months after the fire when HTI was rebuilding its plant, Hartford paid HTI $621,000 for personal business property losses and $150,000 in business interruption proceeds, an amount less than HTI's operating expenses under normal conditions. According to HTI, Hartford's failure to make meaningful business interruption payments caused HTI to be unable to sustain operations while its production plant was being rebuilt. HTI claims that because it lacked sufficient funds for operating expenses during the plant rebuilding it had to dedicate most of its efforts to raising money to stay afloat instead of maintaining customer relationships, promoting products and getting new orders. By the time the manufacturing plant reopened, HTI was in serious financial trouble and, within three months, was forced to sell key assets to another company at less than the true value. In this action, HTI asserts that Hartford's failure to compensate it for its lost business income resulted in the demise of HTI's business and a loss to its shareholders.

///

///

Page 3 - ORDER AND FINDINGS AND RECOMMENDATION

## STANDARDS OF REVIEW

Rule 12(f) allows a court to strike any immaterial matter from a pleading. Fed. R. Civ. P.

12(f). Evidence which is not relevant–"not having any tendency to make the existence of any fact

that is of consequence to the determination of the action more probable or less probable than it would

be without the evidence," is immaterial.

Federal Rule of Civil Procedure 56 allows the granting of summary judgment:

> if the pleadings, the discovery and disclosure materials on file, and any affidavits
> show that there is no genuine issue as to any material fact and that the movant is
> entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c). There must be no genuine issue of material fact. Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 247-48 (1986).

The movant has the initial burden of establishing that no genuine issue of material fact exists

or that a material fact essential to the nonmovant's claim is missing. Celotex Corp. v. Catrett, 477

U.S. 317, 322-24 (1986). Once the movant has met its burden, the burden shifts to the nonmovant

to produce specific evidence to establish a genuine issue of material fact or to establish the existence

of all facts material to the claim. Id.; see also, Bhan v. NME Hosp., Inc., 929 F.2d 1404, 1409 (9th

Cir. 1991); Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1105 (9th Cir.

2000). In order to meet this burden, the nonmovant "may not rely merely on allegations or denials

in its own pleading," but must instead "set out specific facts showing a genuine issue of fact for

trial." Fed. R. Civ. P. 56(e).

Material facts which preclude entry of summary judgment are those which, under applicable

substantive law, may affect the outcome of the case. Anderson, 477 U.S. at 248. Factual disputes

are genuine if they "properly can be resolved only by a finder of fact because they may reasonably

be resolved in favor of either party." Id. On the other hand, if, after the court has drawn all reasonable inferences in favor of the nonmovant, "the evidence is merely colorable, or is not significantly probative," summary judgment may be granted. Id.

## DISCUSSION

**I.     Motions to Strike and Evidentiary Objections**

I first consider the parties' objections to each other's evidence supporting the various motions at issue. At noted above, HTI has filed motions to strike Hartford's evidence in response to HTI's motion for summary judgment on Hartford's counterclaims (#162) and Hartford's evidence in response to HTI's motion for partial summary judgment. (#164). Hartford's objections to HTI's evidence are included in its responses to HTI's concise statements. (#'s 143,145).

Hartford asserts that I should deny HTI's motions to strike on procedural grounds; specifically, HTI's failure to confer before filing the motions as required by Local Rule 7-1. I decline to deny the motions on this basis. I also deny HTI's motion to strike all the deposition testimony Hartford submitted in support of its responses to HTI's motions because the citations do not contain page and line designations as required by Local Rule 56-1.

**A.     Blanket Objections**

HTI seeks to strike the two expert reports of Mark R. Newton, a CPA designated as an expert by Hartford, on the grounds that: (1) Newton has not been qualified as an expert; (2) HTI has not had the opportunity to depose him as an expert and thus cannot properly evaluate his testimony; (3) Hartford did not attach Newton's curriculum vita (CV) to the expert report; and (4) Newton's reports are "replete" with hearsay. I observe that HTI has had two opportunities to depose Newton–as a fact witness and as a 30(b)(6) witness. During his fact witness deposition, HTI questioned Newton

Page 5 - ORDER AND FINDINGS AND RECOMMENDATION

extensively about his qualifications as an "expert CPA" and his background. Moreover, Hartford represents that not including Newton's CV was an oversight and has filed the CV as an exhibit. (#170, exhibit B). I find that given these circumstances, HTI has had the opportunity to examine Newton and has a basis upon which to evaluate Newton's expert opinions. HTI's argument that it has not had the opportunity to fully assess the order entered in Polymer Plastics Corp. v. Hartford Casualty Ins. Co., Case No. 05-CV-00143 ECR (VPC) (D. Nev. Sept. 26, 2006) is not persuasive. Hartford has provided HTI with a copy of the order (#166), which is clearly file stamped by the Clerk of Court in the U.S. District Court for the District of Nevada. Allowing Hartford to use this evidence does not prejudice HTI. Moreover, under Fed. R. Evid. 703, hearsay is admissible as a type of fact or data reasonably relied upon by an expert. For all these reasons, I deny HTI's motion to strike Newton's expert reports.

HTI moves to strike paragraph 2 of Francis Maloney's declaration (#144) for lack of personal knowledge and because it contains hearsay for which there is no exception. HTI also argues that Maloney is using his declaration to contradict Hartford's 30(b)(6) witnesses' testimony in Hartford's response (#145 at ¶ 18) to HTI's concise statement of facts. Maloney's declaration supports Hartford's assertions of Hemp and Augeri's involvement in the claims process and their lack of involvement post-litigation. Id. As Hartford's counsel, Maloney has personal knowledge of who was involved in HTI's claim post-litigation; thus the statements regarding post-litigation claim involvement in paragraph 2 are not hearsay. After carefully reviewing both paragraph 18 of HTI's concise statement of facts (#123 at ¶ 18) and paragraph 18 of Hartford's response (#145 at ¶ 18), I find that Maloney's declaration does not contradict the testimony of Hartford's 30(b)(6) witness. The facts supported by Maloney's declaration are additional facts, which clarify that the witnesses

Page 6 - ORDER AND FINDINGS AND RECOMMENDATION

were not involved in the claim post-litigation. This information does not contradict Hemp and Augeri's testimony that they knew of "no exclusions" barring HTI's claims.

### B.      Specific Objections

#### 1.      Authentication

HTI argues that Hartford's exhibits 14, 28, 83, 98, 121, 122, and 283 submitted in support of Hartford's response to HTI's concise statement of facts (#145) are not properly authenticated because they are not attached to an authenticating declaration or otherwise authenticated. To be admissible, an exhibit must be properly authenticated. Orr v. Bank of America, 285 F.3d 764, 773 (9th Cir.) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment[,] " and authentication is a prerequisite for admissibility.). Under the Federal Rules of Evidence (FRE), the authentication requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). FRE 901(b) gives ten examples of extrinsic evidence that may authenticate an exhibit. The authentication requirement is also satisfied, without any extrinsic showing, by exhibits that are self-authenticating under FRE 902. Such exhibits include public records, newspaper or magazine articles, and other documents with built-in indicia of reliability. Fed. R. Ev. 902(1)-(10).

Hartford's attorney, Maloney, attached the exhibits at issue to his declaration. The exhibits are deposition exhibits. Maloney declares that each of the exhibits are true and correct copies of the exhibits offered during various depositions in this case. For example in ¶ 26, Maloney declares that "[a]ttached hereto is a true and correct copy of deposition exhibit 14, a letter dated August 23, 2007 from Mark Newton to The Hartford." (#144 at ¶ 26). Exhibit 14 has a sticker on it indicating that it is exhibit 14 from Pawloski's deposition. Maloney has sufficient personal knowledge of matters

occurring during this lawsuit to authenticate deposition exhibits. Thus, the exhibits are properly authenticated and may be considered on summary judgment to the extent they contain otherwise admissible evidence.

### 2. Relevance

HTI seeks to strike as irrelevant exhibits C, F, I, K, N, L, Q, T, 14, 75, 98, 121, 122, 124, 154, 175, 180-86, 283 and pages 14-16 and 98 of exhibit C and pages 122-123 of exhibit K. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. The challenged exhibits are clearly relevant to Hartford's counterclaims for breach of contract and declaratory relief, which allege that HTI misrepresented information about its vendors and accounts. HTI's motion to strike them on this basis is denied.

### 3. Hearsay, Lack of Foundation, Best Evidence Rule, Local Rule 56-1 Objections and Undue Prejudice

HTI seeks to strike Hartford's exhibit 14 (letter from Hartford's expert Newton to Hartford) and exhibit L (Newton's declaration) at 57:12-58:16 on the grounds that both are inadmissable hearsay. Hearsay is an out of court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801. The letter relies on an analysis of HTI's records, so if the information contained therein is not based on Newton's personal knowledge. Hartford offers the letter for the truth of the matter asserted in the counterclaims–that HTI misrepresented its relationship with vendors. Newton, however, is Hartford's expert. Thus, to the extent that his August 23, 2007, letter contains hearsay, it is admissible. The challenged portion of exhibit L is Newton's deposition testimony discussing opinions which Newton offered about HTI's requests for advance payment of two million dollars

and Newton's recollection of what a third party (Gilman) had said to him. The testimony regarding Newton's opinions is admissible. The testimony regarding Newton's recollections of Gilman's statements, however, is not. Accordingly, exhibit L at page 58:11-16 is inadmissible hearsay, and I will not consider it in the motion for summary judgment.

HTI contends that the statement in exhibit 14 that HTI would not "have been in a position financially to pay the up front fees required by the Red Cross" and exhibit K should be stricken for of lack foundation. A witness may not offer testimony on an issue unless the witness has personal knowledge of the matter. Fed. R. Evid. 603. To the extent that the statement in exhibit 14 is hearsay, it is admissible under FRE 703 as facts or data relied upon by Hartford's expert. The letter indicates that the analysis therein is based on books and records provided by HTI. A review of exhibit K reveals that deponent Linda Lemer had personal knowledge of the matters to which she testified. The cited testimony stands for the proposition cited in Hartford's response (#145 at ¶24). Thus, exhibits 14 and K comport with FRE 603's requirements.

HTI objects to exhibit K "at page 89," which is cited in Hartford's brief at page 10 on the grounds of undue prejudice because "the cited page is missing from the Maloney declaration." (#163 at 10). The citation on page 10 of Hartford's brief (#147) is to page 83 of Lemer's deposition, which is included in both Maloney's declaration and the declaration exhibits. The relevance of this evidence is not, as HTI asserts, outweighed by prejudice, confusion or waste of time.

HTI asserts that pages 41-42 of Hartford's exhibit L should be stricken because the testimony therein does not stand for the proposition cited in Hartford's response (#143) to HTI's concise statement of facts. After a review of the disputed testimony, it is clear that it supports Hartford's assertion in its response.

Page 9 - ORDER AND FINDINGS AND RECOMMENDATION

HTI seeks to strike exhibit K (Lerner's deposition) and pages 162-168 of exhibit P (Robert Salter's deposition) on the grounds that the cited testimony in each violates FRE 1002, the "best evidence" rule. A review of the exhibits reveals that although both deponents are generally testifying about emails, they are not attempting to recount the content of the documents in their testimony. Instead, each discusses their opinions/impressions of the content of the emails. For example, Salter states that he does not recall other discussions, aside from those in an email, with public adjustors and whether there is a sense of urgency communicated in various emails. The best evidence rule does not preclude these exhibits.

### C.    Hartford's Evidentiary Objections

Hartford objects to a number of HTI's exhibits in its responses to HTI's concise statement of facts. Hartford objects to several exhibits as hearsay. Reviewing these exhibits, it is clear that, although the exhibits are out of court statements, they are not offered to establish the truth of the matter asserted. Moreover, to the extent that Hartford objects to HTI's citation to Hartford's own expert, that evidence is admissible as a party admission under FRE 801(d)(2). Similarly, Hartford's objection to HTI's use of Pawloski's testimony is not persuasive–as Hartford's 30(b)(6) witness, Pawloski's testimony is both admissible and binding.

### D.    Conclusion

Hartford's exhibit L at page 58: 12-16 is stricken. Otherwise, I deny HTI's motions to strike. (#'s 162, 164). I deny Hartford's evidentiary objections.

## II.    Motions for Summary Judgment

Hartford renews its motion for partial summary judgment (#115) on HTI's negligence, breach of the implied covenant of good faith and fair dealing (bad faith) and tortious interference with

prospective economic advantage which was previously filed on May 21, 2010.[2] Hartford argues that under Oregon law, these three tort claims fail as a matter of law. HTI filed a motion for partial summary judgment (#118) asserting that California's law governs and precludes judgement in Hartford's favor. Moreover, HTI asserts that, under California law, it is entitled to immediate payment of its continuing normal operating expenses and extra expense and that all of Hartford's affirmative defenses must be dismissed. HTI also seeks summary judgment on Hartford's counterclaims for breach of contract and declaratory relief. (#119).

### A.    Choice of Law

Before considering the parties summary judgment arguments regarding HTI's tort claims, I must resolve the choice of law dispute. Under California law, an insured may pursue a negligence action against a carrier on a first party insurance contract but this remedy is generally unavailable under Oregon law [See discussion, *infra*, regarding HTI's negligence claim]. As noted above, the parties disagree about what state's substantive law applies to HTI's tort claims under Oregon's choice of law statute ORS 31.875: Hartford asserts Oregon law applies; HTI argues that the statute dictates that California law governs.

Federal courts sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). Oregon, the forum state here, enacted a new choice of law statute for tort conflicts, ORS §§ 31.850-890, on January 1, 2010. The relevant potion of the statute provides:

---

[2]In an Order and Findings and Recommendation filed on August 5, 2010 (#60), I denied Hartford's motion as premature and allowed Hartford to renew its motion after the close of discovery.

(c) if the injurious conduct occurred in one state and the resulting injury in another state, the law of the state of conduct governs. However, the law of the state of injury governs if:

(A) The activities of the person whose conduct caused the injury were such as to make foreseeable the occurrence of the injury in that state: and

(B) The injured person formally requests the application of that state's law by a pleading or amended pleading. The request shall be deemed to encompass all claims and issues against that defendant.

Or. Rev. Stat. § 31.875(c).

The parties agree that the resulting injury occurred in Oregon, but disagree about where the allegedly injurious conduct occurred. HTI argues that the conduct occurred in California because that is where the two principal claim adjustors lived. Hartford argues that the conduct occurred in Connecticut because all payment decisions were made there.

The conduct HTI complains of is Hartford's failure to make business interruption payments to HTI. The record establishes that all decisions regarding amount of coverage or payment were made by either Augeri or Hemp in Connecticut. Thus, the action (or inaction) giving rise to HTI's tort claims occurred in Connecticut. HTI's contention that the tortious conduct took place in California is not persuasive. Although plaintiff strives to focus on the allegedly negligent evaluation by the adjustors, the crux of the case is the amount paid by Hartford to HTI under the policy. ORS 31.875(c) states: "if the injurious conduct occurred in one state and the resulting injury in another state, the law of the state of conduct governs...." Id. (emphasis added). Here, two of Hartford's adjustors evaluated HTI's claim in California where they lived, but all decisions regarding payment of HTI's claims, which is the conduct at issue in this suit, occurred in Connecticut. Thus, under the plain language of ORS 31.875(c), California law cannot apply because the injurious conduct–the decision about payment of HTI's claim, did not happen in that state.

Page 12 - ORDER AND FINDINGS AND RECOMMENDATION

Similarly unavailing is HTI's contention under ORS 31.865(2) that, because Hartford is domiciled[3] in both California and Connecticut, Oregon's choice of law statute allows HTI to select either domicile and apply that state's law to the dispute on the basis that "the dispute arises from the activities directed from another state in which [Hartford] maintains a place of business..."

As noted above, the "activities" or conduct which caused the injury occurred in Connecticut where the ultimate decisions were made on HTI's Claim. Moreover, Oregon's conflict of law rules provide that in a situation where conduct from one state resulted in injury in another state, the law of the state of injury governs if: (1) the activities of the person (or entity) whose conduct cause the injury made the occurrence of the injury foreseeable in the state of injury; and (2) the injured party "formally requests the application of the state's law <u>by a pleading</u>." Or. Rev. Stat. 31.875(c). (emphasis added) Here, as Hartford concedes, it was foreseeable that its decisions on payment of HTI's policy would cause an injury in Oregon. And, the record shows that HIT has formally requested the application of Oregon law in its complaint. All of HTI's tort claims are pled under Oregon Law (#1 at ¶¶ 73, 78, 90). For these reasons, I find that Oregon law applies to HTI's tort claims.

Moreover, even assuming <u>arguendo</u> that subsection (c) is not applicable, ORS 31.875(4) dictates that Oregon law governs HTI's tort claims. Under subsection (4):

> If a party demonstrates that application to a disputed issue of the law of a state other than the state designated by subsection (2) or (3) of this section is substantially more appropriate under the principles of ORS 31.878, that issue is governed by the law of the other state.

<u>Id.</u>   Under ORS 31.878, "[t]he most appropriate law is determined by:"

---

[3]This discussion does not analyze HTI's claim that Hartford is properly domiciled in both California and Connecticut.

(1) Identifying the states that have a relevant contact with the dispute, such as the place of the injurious conduct, the place of the resulting injury, the domicile, habitual residence or pertinent place of business of each person, or the place in which the relationship between the parties was centered;...

Id. Here, the relevant dispute centers on Hartford's payment of HTI's claim. As discussed above, the place of the injurious conduct–the decision to deny payment, was Connecticut. The resulting injury occurred in Oregon. While it is true that two insurance adjustors reside in California and the accountant hired to evaluate the claim is domiciled in Washington, the pertinent residence and place of business of the persons who made the decision about payment of HTI's claim is Connecticut. Moreover, Oregon has a substantial interest in regulating insurance contracts which insure property in Oregon. To that extent, Oregon has legislated an extensive statutory framework that regulates nearly every aspect of Oregon's insurance industry. See e.g., Or. Rev. Stat. §§ 742.003; 009; 013;023;200; and 202). In short, the states having relevant contact with the dispute–whether Hartford's denial of HTI's claim gives rise to civil liability, are Oregon and Connecticut.

For all those reasons, I find that, under Oregon's choice of law rules, Oregon law governs HTI's tort claims against Hartford.

## B.    HTI's Negligence and Breach of the Implied Covenant of Good Faith Claims

Hartford argues that, under Oregon law, it is entitled to summary judgment on HTI's negligence and breach of the implied covenant of good faith claims. In Georgetown Realty v. The Home Ins. Co., the Oregon Supreme Court discussed the choice between contract and tort remedies, stating in relevant part:

> When the relationship involved is between contracting parties, and the gravaman of the complaint is that one party caused damage to the other by negligently performing its obligations under the contract, then, and even though the relationship between the parties arises out of the contract, the injured party may bring a claim for negligence

> if the other party is subject to a standard of care independent to the terms of the
> contract. If the plaintiff's claim is based solely on a breach of a provision in the
> contract, which itself spells out the party's obligations, then the remedy normally will
> be only in contract, with contract measure of damages and contract statutes of
> limitation. That is so whether the breach of contract was negligent, intentional, or
> otherwise.

Id. 313 Or. 97, 106 (1997) (emphasis added). Thus, the relevant question is whether Hartford was

"subject to a standard of care independent of the contract." Id. If it was, HTI may sue in tort as well

as in contract. If it was not, HTI's sole remedy lies in contract.

Relying on Goddard v. Farmers Ins. Co., HTI contends that it can pursue its tort claims

because Oregon's Insurance Code subjected Hartford to an independent standard of care. Id., 344

Or. 232 (2008). HTI argues that Hartford breached its duty to act in good faith because it waited

over six months before paying any money on HTI's business interruption loss and then waited a year

before paying the balance of HTI's business loss, despite knowing that HTI was in financial trouble.

Further, according to HTI, Hartford, without explanation, never paid HTI's claim for continuing

operating expenses and rejected HTI's extra expenses claim without any justification. HTI also

contends that summary judgment is not appropriate on its claim that Hartford breached the implied

covenant of good faith because Oregon law recognizes that the duty of good faith is implied by law

into every contract. Thus, dismissing this claim would render the duty of good faith illusory.

Although Goddard recognized that insurers are subject to the provisions of Oregon's

Insurance Code, its holding is not instructive here. The Goddard court considered whether an insurer

in a third party liability action had fair notice that its failure to settle a claim within policy limits was

tortious conduct and thus subject to punitive damages. Id. 344 Or. at 263. In finding that the insurer

did have notice of the potential for punitive damages, the court stated:

...the Farris court distinguished between an insurer's bad faith claim failure to defend and a bad faith failure to settle: '...In an action for failure to settle within the policy limits, the insurance company is charged with acting in a fiduciary capacity as an attorney in fact representing the insured's interest in litigation.  The company's interest comes into conflict with that of the insured's while representing him; and, arguably, acting in its own interest to the detriment of the insured's interest while acting in such a fiduciary capacity is a tort.  In the present case defendant did not undertake in this fiduciary duty to represent the insured's interest in the litigation-it refused it.  It did not, in the course of representing plaintiffs, violate its fiduciary duty arising out of the sole control of the settlement.  It never undertook any fiduciary duty by purporting to act in the interest of the insured.'

Thus, although the Ferris court did hold that a liability insurer's refusal to defend its insured  at all was purely a breach of contract, it did not apply that same holding to insurers who, like defendant, failed to settle their claims against their insureds within policy limits....We do not rest our holding respecting fair notice [of the possibility of punitive damages in an action for failing to settle a claim within policy limits] solely on distinctions [between prior cases], however. The legislature has spoken in a relevant way on this issue.  Specifically, long before defendant engaged in the conduct at issue, the legislature had enacted the Oregon Insurance Code, which includes a provision that forbids an insurer to use the kind of tactics that this defendant used.

Id. at 264-65, quoting Ferris v. U.S. Fid. and Guar. Co., 284 Or. 453 (1978)[4] (internal citations

omitted) (emphasis in original).

Unlike the insurer in Goddard, this dispute involves a first party insurance contract in which

HTI sought payment from Hartford for economic damages stemming from a covered loss. Hartford

did not undertake any fiduciary duty that allowed it to exercise its judgement on HTI's behalf.

Moreover, in Goddard the insurer's actions on behalf of the insured during settlement negotiations

---

[4]In Ferris, the court considered whether an insured's action against his insurer for damages resulting from the insurer's denial of liability insurance sounded in tort so that the insured could recover emotional distress damages.  The court concluded that such denials of coverage are a breach of contract and thus support only normal contract damages.  Id. at 459-60.

and not Oregon's Insurance Code, gave rise to the extra-contractual duty and tort liability. It is clear under Oregon law that claims for violations under Oregon's Unfair Claims Settlement Practices Act, the code provision cited in Goddard, are not independently actionable. Farris, 284 Or. at 458. Thus, viewing the facts in a light most favorable to HTI, there is no evidence to support a conclusion that Hartford became obligated to employ a standard of care independent of the terms of the policy contract. HTI's negligence claim fails as a matter of law.

Tort damages may not be awarded upon a finding of breach of contract. However, HTI may recover damages for a breach of the implied covenant of good faith which attaches to every contract, otherwise the duty would be illusory. In other words, Hartford's good faith duty does not stand alone in tort but is instead a direct and natural corollary of its duty to pay HTI's policy claims in a timely manner. Without this duty, an insurer could avoid its contractual obligation because many insureds might be unable or unwilling to continue to operating normally and incur expenses, thus short-circuiting the insurer's contractual duty to pay under the policy language.   Moreover, if the law offered no recourse for a breach of the duty to act in good faith, the worst that could happen to a defendant insurer acting in bad faith would be that it would have to pay only what was owed under the terms of the contract and would owe nothing for the damages flowing from the breach of the implied duty to act in good faith.

Thus, Oregon law recognizes that the duty to act in good faith is a contractual duty which serves to protect the objectively reasonable contractual expectations of the parties, Uptown Heights Assoc. v. Seafirst Corp., 320 Or. 638, 645 (1995), and specifically acknowledges that the duty finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. McKenzie, 118 Or. App. at 381. Under general principles of contract law, the

breach of that duty gives rise to a claim for damages. Cont. Plants Corp. v. Measured Mkt. Serv., 274 Or. 621, 625-26 (1976). The measure of those damages is generally stated in terms of the "benefit of the bargain." Corder v. A & J Lumber Co., Inc., 223 Or. 443, 449 (1960). The damages are limited to those foreseeable at the time of the execution of the agreement. Cont. Plants, 274 Or. at 625-26. Here, the policy provided business interruption coverage in the event of a covered loss. Should a jury find that Hartford arbitrarily refused to pay HTI's claim—conduct which frustrated HTI's contractual expectations, and that HTI's damages were a foreseeable result of the breach of the contract, those damages can be awarded under the contract claim. McKenzie, 118 Or. at 381; see also, Eggiman v. Mid-Century Ins. Co., 134 Or. App. 381, 386 (1995) (concluding "that within defendant's obligation to pay all covered claims was the duty to determine, in good faith, whether a claim is covered and to refrain from arbitrarily refusing to preauthorize medical treatment." ) (quoting McKenzie) (emphasis in original).

Because the agreement between the parties did not give rise to a special relationship, and further because, even giving all inferences in favor of HTI, Hartford's conduct did not amount to active control of HTI's interests as to allow a special relationship to develop, the court should grant summary judgement on HTI's tort claim for negligence. The court should grant summary judgment on HTI's independent tort claim for breach of the implied covenant of good faith; however, should a jury find that the damages HTI suffered were a foreseeable result of a breach of the contract and that HTI suffered foreseeable harm as a consequence, all such damages may be awarded under the contract claim.

///

///

Page 18 - ORDER AND FINDINGS AND RECOMMENDATION

C.    **Tortious Interference with Prospective Economic Advantage**

Interference with a business relationship is an intentional tort. Straube v. Larson, 287 Or. 357, 360 (1979). To state a claim for tortious interference with economic relationships, a plaintiff must establish six elements: (1) the existence of a business or professional relationship; (2) intentional interference with that relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a casual effect between the interference and the harm to the relationship; and (6) damages. Fox v. Country Mut. Ins. Co., 169 Or. App. 54, 69-70 (2000).

Hartford moves for summary judgment on HTI's tortious interference with prospective economic advantage claim on the grounds that there is no evidence that Hartford acted with the intent or purpose of interfering with HTI's contracts with its vendors. Instead, Hartford argues that this claim distills down to, at most, "a valuation dispute between the parties...." (#116 at 24). Hartford argues that it lacked reason or motive to interfere with HTI's business relationships with its vendors and that HTI's claim is based on speculative future sales not existing business relationships. Moreover, Hartford contends that it only contacted HTI's vendors (with HTI's express permission) to verify HTI's statements in support of its business interruption claim, investigative activity specifically allowed by the insurance policy's language.

HTI argues that Hartford intentionally withheld funds from HTI during its restoration period, destroying its relationships with vendors, with the intent of harming HTI's sales so Hartford could avoid paying additional business interruption benefits, which are measured by post-restoration sales. To support its argument, HTI relies on Employers' Fire Ins. Co. v. Love It Ice Cream Co., 64 Or. App. 784 (1983). In Love It Ice Cream Co., after the insurer brought suit seeking a declaration that

it had no liability for the loss, the insured brought a counterclaim alleging that the insurer brought the action to delay and ultimately reduce claim payments. The trial court granted the insurer's motion to dismiss the counterclaim. The Court of Appeals found the insured's allegations were sufficient to make out a tort claim for interference with business relationships through use of improper means because plaintiff's insurer filed litigation "which it knew to be unfounded for the purpose of delaying payment of [its insured's] claim." Id. at 792. The Court of Appeals remanded the case to the trial court for further proceedings on the business interruption claim.

HTI claims that during Hartford's investigation of its business interruption claim, Hartford discovered that HTI had developed relationships with several large vendors (including Wal-Mart, Sam's Club and Costco), was moving forward with a licensing agreement with the Red Cross, and was developing a broad Internet sales and marketing campaign. Hartford's claims adjustor told HTI that Hartford would reevaluate the business interruption claim if HTI had substantial sales after it resumed manufacturing at pre-loss levels. According to HTI, however, Hartford withheld meaningful policy payments so as to destroy HTI's business relationships so that Hartford would not have to make additional policy payments.

In support of its motion for judgment on this claim, Hartford submits evidence that, upon receiving HTI's business interruption claim, Hartford investigated the value of the claim, which included getting reports from a third-party accounting firm. (#144, ex. 14). The accounting firm's report valued HTI's claim much lower than HTI valued its claim. In explaining the lower valuation, the report noted that despite listing numerous potential customers, HTI provided invoices for only eight. The report noted that Sam's Club had access to HTI's entire post-fire inventory, but had not reordered. Sam's Club, moreover, was unaware of the fire, so it had not affected its orders.

Page 20 - ORDER AND FINDINGS AND RECOMMENDATION

Additionally, the report concluded that HTI's pending license agreement with the Red Cross would not have come to fruition because, even before the fire, HTI could not afford to pay the Red Cross's licensing fee.  Id.  Other evidence submitted by Hartford buttresses the accounting report's conclusions.  For example, in an email between HTI executives and the Red Cross, HTI's Vice President asks the Red Cross representative "what percentage we could realistically negotiate [the royalty amount to." (#114, ex. 98).  HTI's Chief Financial Operator joins the email string the next day stating "[u]ntil we get more financing lined up, how can we pay anything up front???" Id.

Here, unlike in Love It Ice Cream Co. which focused on a Rule 12 motion to dismiss, the issue is whether a reasonable jury could find for HTI, not whether the claim is sufficiently pled. As discussed, Hartford has offered specific evidence to establish that it did not act with an intent to interfere with HTI's business relationships. The evidence instead establishes that Hartford took steps to value HTI's loss claim.  In short, although the valuation of HTI's business loss (and whether certain relationships were actual or potential future relationships) is disputed by the parties, the facts–even taking them in a light most favorable to HTI, do not support a claim for intentional interference with a business relationship.  In opposition to judgment on this claim, HTI offers only assertions and not specific evidence or facts that Hartford intentionally sabotaged its business relationships.  Mere assertions are not sufficient to defeat a motion for summary judgment once the movant has established that a material element of the nonmovant's claim is missing.  Celotex, 477 U.S. at 322-24.  Because a reasonable jury could not find that Hartford acted with the intent to interfere with HTI's business relationships, the court should grant summary judgment on this claim.

///

///

**D.     HTI's Continuing Operating Expense and Extra Expense Claims**

The parties filed cross motions for summary judgment on HTI's claims for continuing operating expenses and extra expenses; each arguing that the policy's plain language entitles them to judgment as a matter of law.

Interpretation of an insurance policy is a matter of law. N.Pac. Ins. Co. v. Hamilton, 332 Or. 20, 24 (2001). When construing a policy, the court determines the intent of the parties through a three step process. Hoffman Constr. Co. v. Fred S. James & Co., 313 OR. 464, 469 (1992). First, the court examines the policy's text and applies the definitions supplied by the policy with the presumption that the words used have their plain, ordinary meaning. Tualatin Valley Hous. v. Truck Ins. Exch., 208 Or. App. 155, 159 (2006). If the policy provision has only one plausible meaning, the court applies that interpretation. Andres v. Am. Standard Ins. Co., 205 Or. App. 419, 423 (2006). If the policy provision has more than one plausible interpretation, the court examines the provision in the context of the entire policy. Id. at 424. If the ambiguity persists, the court resolves it in favor of the insured. Hoffman, 313 Or. at 467-72. A court should not, however, consider extrinsic evidence in resolving ambiguities in policy provisions. Bresee Homes, Inc. v. Farmers Ins. Exchange, 227 Or. App. 587 (2009).

**1.     Continuing Operating Expenses**

HTI asserts that the policy language obligated Hartford to pay its continuing operating expenses during the period of restoration and seeks an order requiring Hartford to pay over 2.6 million dollars plus prejudgment interest. Hartford seeks a finding that, under the policy language, Hartford is only obligated to pay for the actual loss HTI sustained.

The policy's business interruption provision states:

> We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration."

(#121, ex. 1 at p. 10 of 25 section (o)). The Policy defines "business income" as:

> (a) Net Income (Net Profit of Loss before income taxes) that would have been earned or incurred if no direct physical loss or physical damage had occurred; and but for the covered loss; and

> (b) continuing normal operating expenses incurred, including payroll.

Id. section (o)(4)(a) and (b).

Here, examining the policy's text and applying the plain and ordinary meaning of the words used, the meaning of the Business Income provision is clear: Hartford is obligated to pay for the insured's actual loss of business income. The policy calculates business income by considering the net income—the pre-tax net profit or loss that would have been earned or incurred without the damage and continuing operating expenses, including payroll. (# 121, ex. 1 at p. 10 of 25 section (o)(4)(a) and(b)) (emphasis added)). The use of "and" indicates that the profit or loss and continuing operating expenses are jointly considered . See e.g., Caminetti v. United States, 242 U.S. 470, 485-86 (1917) (words are presumed, "unless the contrary appears, to be used in their ordinary and usual sense."); Fries v. John Hancock Mut. Life Ins. Co. of Boston Mass., 227 Or. 139, 146 (1961) ("Since the defendant's policy of insurance uses the conjunctive 'and' with reference to the cause of injury, 'violent, external and accidental,' each of these elements must be present to create liability thereunder.").

HTI argues that the plain meaning of the policy's text is that Hartford would cover the loss of its business income in addition to the continuing normal operating expenses. Based on its interpretation, HTI argues Hartford violated the policy by focusing only on HTI's net income that it would have earned but for the fire (and Hartford ultimately concluded HTI would have sustained

Page 23 - ORDER AND FINDINGS AND RECOMMENDATION

a loss) and never considering HTI's continuing operating expenses. Hartford contends that the policy language means that the sum of the net profit (or loss) and operating expenses is the correct formula for calculating business income. Hartford also notes that HTI's policy interpretation ignores the context of the policy–it ignores the policy obligation to pay for "actual loss."

As Hartford's policy uses "and" with reference to what business income means: "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no [loss] had occurred; and continuing normal operating expenses incurred, including payroll," both of these elements must be considered when calculating business loss. Business income is clearly a two part calculation. Further, examining the provision in the context of the policy as a whole, the only plausible interpretation is that the net income and operating expenses are considered together. Thus, if an insured would have realized a net profit (but for the fire), that amount would be added to the continuing normal operating expenses to determine the insured's business income. Similarly, if an insured would have realized a net loss, that amount would be deducted from the continuing normal operating expenses to determine the business income. It is not plausible to read the policy as requiring Hartford to pay an insured's continuing operating expenses without considering the insured's projected net profit or loss. Such a reading would result in a windfall to the insured instead of a payment for actual loss. See e.g., B.F. Carvin Const. Co. v. CNA Ins. Co., 2008 WL 5784516 (E.D. La July 14, 2008) (construing a similarly worded policy and stating that "this type of policy is designed to 'prevent the insured from being placed in a better position than if no loss or interruption of business had occurred.'" (internal citation omitted)). Considering net profit or loss and continuing operating expenses as a two part calculation is the only plausible reading of the provision which would result in a determination of the insured's actual business income.

Page 24 - ORDER AND FINDINGS AND RECOMMENDATION

I am mindful that HTI has produced evidence that Hartford's adjustors testified during depositions that they expected Hartford's accounting firm to calculate HTI's continuing operating expenses and for Hartford to pay the expense, even if HTI was not operating at a profit. However, as discussed above, my resolution of any ambiguities in the policy language should not consider extrinsic evidence. Considering the plain language of the policy provision's text as well as considering the provision within the context of the policy as a whole, the only plausible interpretation is that business income is the sum of the net profit or loss and the continuing operating expenses.

The court should deny HTI's motion for judgment on its breach of contract claim based on Hartford's failure to pay its business income claim and for an order that Hartford pay its continuing operating expenses of over 2.6 million dollars plus prejudgment interest. The court should grant Hartford's motion for a finding that the method for calculating a business income loss set forth by the policy is consideration of sections (a) and (b) together. Thus, in the event of a net projected profit, the business income loss will be calculated by adding the amount of the profit to the amount of the continuing operating expenses, or, in the event of a projected net loss, the business income will be calculated by subtracting the net loss from the amount of the continuing operating expenses.

### 2. Extra Expense Claim

HTI argues that it is entitled to summary judgment on its claim that Hartford breached the insurance contract by failing to pay its extra expense claim and is thus entitled to $675,907.31 plus prejudgment interest. According to HTI, although it tendered its extra expense claim nearly two years ago, Hartford has never accepted, denied or provided any written explanation for its refusal to

pay the extra expense claim. HTI argues that Hartford's actions amount to a bad faith breach of the

policy. Hartford argues that this claim fails as a matter of law.

Under the policy "extra expense" means expenses incurred:

> (a) to avoid or minimize the suspension of business and to continue
> 'operations'
>> (i) At the 'scheduled premises';
> (b) To minimize the suspension of business if you cannot continue
> 'operations.'

(#121, ex. 1 at p. 10 of 25 (section (p)(3)(a) and (b)). Hartford argues that two limitations to the

Extra Expense coverage are relevant here:

> There is a maximum of 12 months of "Extra Expense" coverage–we will only pay
> for Extra Expense that occurs within 12 consecutive months after the date of direct
> physical loss or physical damage."
> Any expenses incurred due to cancelled or lapsed contracts or any other
> Expense...caused by or resulting from...Suspension, lapse or cancellation of any
> contract. But if the suspension, loss or cancellation is directly caused by the
> suspension of operations, we will cover such loss that affects your Business Income
> during the 'period of restoration.' [or] b. Any other consequential loss.

Id. at p. 18 of 25 (section (4)(a) and (b). HTI argues that the only relevant issue in considering

whether this claim can go forward is that HTI needed to borrow money to avoid suspension of its

operations after the fire loss and that Hartford cannot oppose the extra expense claim on grounds not

identified by its Rule 30(b)(6) witnesses.

As set forth above, the extra expense coverage does not include expenses incurred due to

cancelled or lapsed contracts. Under Oregon law, HTI's line of credit with the bank is a contract.

Modoc Meat and Cattle Co. v. First State Bank of Oregon, 271 Or. 276, 284-85 (1975). The policy

language, however, clearly covers suspension, lapse or cancellation of contracts caused directly by

the suspension of operations. Here, HTI's CEO testified during deposition that, after the fire loss,

the bank president told him that the bank believed that Hartford was not going to "provide any

Page 26 - ORDER AND FINDINGS AND RECOMMENDATION

meaningful relief for [HTI]" and because HTI was unable to continue operations, the bank called in

the line of credit. (#121-15 at *6 (Salter Declaration at 206:19-25-207:1-12)). Salter went on to

agree that there were multiple reasons the bank called in the line of credit–"[HTI] burned down and

..had no financial ability to stay in business and get back in business without payments." Id.

Hartford characterizes Salter's testimony as an "assumption" which does not create an issue of fact

regarding why the bank opted not to renew HTI's line of credit. I find, however, that the policy

language covers suspension, lapse or cancellation of contracts caused directly by the suspension of

operations and that, based on the evidence, a reasonable jury could conclude that the bank did not

renew HTI's line of credit due to the fire.

The evidence also shows that when the bank decided not to renew HTI's line of credit, it

demanded that the seven guarantors who secured the $800,000 line of credit (which was borrowed

up to the limit) pay the loan immediately. After the guarantors paid their guaranteed pro rata share

to the bank, HTI offered each guarantor a note at 12% interest to avoid any recourse which would

have forced suspension of HTI's operations. Under the First Private Placement, the guarantors could

defer the monthly interest payment until the end of the note term and then the monthly interest would

be compounded. As a result, HTI ultimately incurred a total of $148, 844.25 in interest. (#120 at

¶ 20). Hartford argues that this does not establish a casual connection between the fire loss and the

First Private Placement. Given the evidence on the record, I find HTI has established a dispute of

material fact regarding whether the First Private Placement was caused by the fire loss, and thus

covered by the extra expense policy. Similarly, I find that a reasonable jury could conclude that

HTI's Second Private Placement (a convertible note financing of 2.5 million with the same terms

as the First Private Placement) was caused by the fire loss. The record indicates that prior to the fire

Page 27 - ORDER AND FINDINGS AND RECOMMENDATION

loss, HTI was able to secure lines of credit to maintain its cash flow, but after the fire, this source

of funding dried up and HTI had to resort to private placements for cash infusions. Accordingly, a

reasonable jury could conclude that the amount incurred as a result of the Second Private

Placement–$494.009.56 was a covered extra expense under the policy language.

Hartford argues that the extra expense claims fail as a matter of law because they are

untimely. The policy language states that there is a "maximum of 12 months of "Extra Expense

Coverage–'We will only pay for Extra Expense that occurs within 12 consecutive months after the

date of physical loss." (#121 at p. 18 of 25 (section (4)(a) and (b)). Here, the record shows that HTI

incurred the First and Second Placement obligations in September 2007. (#120 at ¶¶ 20 and 22).

The 12 month covered period ended in March 2008. I find that because HTI entered into a binding

contractual agreements, these agreements qualify as extra expenses occurring within the 12 month

period, even if HTI paid the obligations after the 12 month period ended. See, e.g., In re CHG Int'l,

Inc., 897 F.2d 1479, 1486 (9th Cir.1990) (A debt is incurred when the debtor first becomes legally

obligated to pay).

After careful consideration, I am not persuaded by Hartford's argument that HTI's extra

expense claim fails as a matter of law because it is a derivative claim. Hartford argues that the crux

of HTI's extra expense claim is that HTI was forced to rely on its line of credit and Private

Placement loans to fund its business when Hartford allegedly failed to timely pay HTI's business

interruption claim. The policy language, however, covers extra expenses resulting from the

cancellation of a contract directly caused by the suspension of business. (#121 at p. 18 of 25 (section

(4)(a)(1) and (2)). Here, the extra expenses incurred by HTI stemmed from the non-renewal of its

line of credit which a reasonable jury could find was directly related to the fire loss.

I recommend that the court deny the parties' cross motions for summary judgment on HTI's extra expense claim.

### E.    HTI's Motion to Dismiss Hartford's Affirmative Defenses

HTI argues that Hartford has failed to substantiate most of its affirmative defense claims, and thus, the court may dismiss those claims as a matter of law. The parties agree that Hartford has withdrawn its First, Second, Sixth, Seventh, Eighth, Ninth, Tenth and Twelfth affirmative defenses. Accordingly, I recommend that the court dismiss those affirmative defenses.

After careful consideration, I conclude that Hartford has established evidence sufficient to substantiate its Third, Fourth, Fifth, Eleventh, and Thirteenth affirmative defenses. Thus, I recommend that the court deny HTI's motion to dismiss these affirmative defenses.

### F.    HTI's Motion For Summary Judgment on Hartford's Counterclaims

On January 4, 2011, Hartford filed its Amended Answer, Affirmative Defenses and Counterclaims alleging two counterclaims: Declaratory Judgment and Breach of Contract. Hartford alleges that HTI engaged in fraud, misrepresentations and concealments and that these actions voided the policy barring recovery for HTI's claim and, thus, HTI must reimburse Hartford for the amount Hartford previously paid on the claim ($1,239,000.15) plus prejudgment interest. (#106).

HTI moves for summary judgement on the counterclaims arguing that it was "sandbagged" by Hartford's counterclaims and that Hartford cannot establish the elements required for a fraud claim. HTI also contends that it is entitled to judgment because the testimony of Hartford's two 30(b)(6) witnesses contradicts Hartford's fraud allegations. Hartford opposes HTI's motion.

First, I consider HTI's argument that it was "sandbagged" by Hartford's counterclaims. Essentially, HTI argues that Hartford's fraud claims are not alleged with sufficient particularity and

Page 29 - ORDER AND FINDINGS AND RECOMMENDATION

that the fraud theories–which include six new vendors when Hartford's motion to amend its answer

to file the counterclaims named only one vendor, are untimely. Hartford's counterclaim is not

subject to the heightened standard of pleading required for fraud claims because Hartford is alleging

a breach of the policy provision regarding "concealment, misrepresentation, or fraud" and is not

alleging common law fraud. After reviewing Hartford's counterclaims, it is apparent that the

amended answer gives HTI fair notice of Hartford's underlying factual theories. Additionally, the

record establishes that even if Hartford's Rule 30(b)(6) did not answer HTI's questions to its

satisfaction during his deposition, Hartford gave HTI an outline of the factual basis, for all vendors,

upon which it was relying upon for its counterclaims. (#144, ex. 315). Finally, the addition of six

new vendors when only one was named in Hartford's motion to file an amended answer does not

entitled HTI to judgment as a matter of law. A review of the underlying record indicates that the

factual basis for adding these additional vendors was well known to both parties. Thus, HTI cannot

claim to be prejudiced by addition of these vendors. In short, HTI's "sandbagging" argument does

not entitle it to judgement on Hartford's counterclaims.

　　　HTI asserts that the court should grant summary judgment because Hartford's corporate

representatives' testimony contradicts its counterclaims. Both Pawloski and Gilman–the supervising

and "front-line" adjustors on HTI's claim, testified during their respective depositions that they were

unaware of fraud in HTI's business interruption claim. This, however, does not carry the day for

HTI. Neither Pawloski nor Gilman were Hartford's Rule 30(b)(6) designees for the purposes of

Hartford's counterclaim. (#144, ex. 294). Instead, the two were designated for the topic of

Hartford's handling, investigation and adjustment of HTI's business interruption claim. Moreover,

Pawloski and Gilman were involved with HTI's claim from March 2007 through February 2010,

and, according to Hartford, the information regarding fraud, misrepresentation and concealment was only disclosed during discovery in this litigation–after the February 2010 date. In short, although the record shows that the two adjustors were unaware of any fraud–which might go to the factual basis of Hartford's counterclaims, their lack of knowledge does not defeat Hartford's counterclaims.

HTI next argues that Hartford's counterclaims fail for lack of evidence that HTI willfully made material misrepresentations or that Hartford relied on any alleged misrepresentations made by HTI. Hartford's counterclaims assert that HTI misrepresented nearly every vendor relationship upon which its loss of business claims were based. Essentially, Hartford asserts that HTI misrepresented very preliminary negotiations as final vendor distribution agreements. For example, according to Hartford, HTI and its vendor Reliance had never reached a firm distribution agreement because they never agreed upon a price per unit; however, HTI's business loss claim included over $300,000 in sales to Reliance. According to Hartford, before the fire loss, Reliance employee Linda Lemer mailed HTI a very preliminary distribution agreement, which did not include a price per unit term. Despite this, HTI submitted the preliminary agreement in support of its loss claim, with HTI having filled in a price per unit of $16.80. HTI disputes these assertions, claiming that the parties had reached a agreement, including the price per unit.

During its investigation of HTI's loss claim, in July 2007, Hartford had a conference call with Lemer. Many details of that call are disputed, but Lemer now testifies that, during the call, she probably said that if Reliance and HTI had been able to agree on a price term, Reliance would have purchased 40,000 units. Lemer also later testified in January 2011 that she never would have agreed

///

///

to the pricing of $16.80 per unit.[5] Many aspects of HTI's relationship with Reliance are disputed, but Hartford has produced evidence indicating that HTI represented to Hartford that it had an agreement to sell over three hundred thousand dollars worth of merchandise to Reliance and that deal fell through due to the fire loss. Hardford has also established that it relied on HTI's representations in making a business interruption claim payment to HTI.    Given all the other facts in dispute–whether the parties a final distribution agreement and whether the agreement fell through due to the fire or a dispute over pricing, Hartford's breach of contract claim based on misrepresentations and concealment is best resolved by a jury.

Similarly, Hartford's breach of contract claim regarding other vendors is best resolved by a jury. Hartford argues that HTI misrepresented its distribution agreement with Costco and has produced evidence that a Costco representative testified that Costco and HTI were in the preliminary stages of an agreement and had never discussed price, volume or dates or purchase. Hartford has produced evidence that HTI's agreement with Pacific Defence was also in the very preliminary stages. With regard to all the vendors names in Hartford's counterclaims, a reasonable jury could find that HTI's alleged misrepresentations were willful. Hartford has additionally established that it acted to its detriment based on HTI's representations regarding its vendor relationships–paying a portion of the loss claim based on HTI's relationship with Reliance and expending costs on investigating HTI's continued loss claims regarding its vendor relationships. See, e.g., Eslamizar

---

[5]In its supporting briefing, HTI argues that Lemer's January 2011 testimony contradicts her statements during the July 2007 conference call. This may be true–although Lemer now states that, during the conference call, she probably said that if the parties could agree on a price Reliance would purchase HTI's products. In any case, I cannot, as a matter of law, decide which of Lemer's statements are true. Or whether HTI knew, as Lemer seems to now imply, that there was no firm distribution agreement. That is a matter of credibility best left to a jury.

v. Am. States Ins. Co., 134 Or. App. 138, 139 (1995) (to prevail on a claim of misrepresentation under Oregon law, an insurer must present "some evidence of a detrimental action or change in position" and a insurer need not show it believed its insured's alleged misrepresentations to establish reliance). For these reasons I recommend that this court deny HTI's motion for summary judgment on Hartford's counterclaims.

Finally, HTI cannot establish that Hartford is estopped from pursuing its forfeiture counterclaim.

> To constitute estoppel by conduct there must (1) be a false representation; (2) it must be made with knowledge of the facts; (3) the other party must have been ignorant of the truth; (4) it must have been made with the intention that it should be acted upon by the other party; (5) the other party must have been induced to act upon it.... The party seeking estoppel must establish reliance and a right to rely on the representation of the estopped party. Reliance is not justified where a party has knowledge to the contrary of the fact or representation allegedly relied upon.

Bruer's Contract Cutting v. Nat'l Council on Compensation Ins., 116 Or. App. 485, 489-90 (1992) (internal citations omitted). Here, Hartford asserts that it lacked knowledge of the facts which support its counterclaims until well into discovery in this litigation. Thus, HTI cannot establish an essential element of its estoppel claim. Moreover, estoppel is an equitable relief and one of the maxims of equity is that a party seeking such must come to the court with clean hands. Osborne v. Nottley, 206 Or. App. 201, 205 (2006). To disqualify a party from equity, the "dirt" upon the party's hands must be "his bad conduct in the transaction complained of." North Pac. Lumber Co. v. Oliver, 286 Or. 639, 652 (1979). Here, there is a disputed issue of fact regarding HTI's conduct regarding its representations upon which its business loss claim is based. Accordingly, even if HTI could establish the elements of estoppel, it would be barred from this defense by these issues of fact regarding its conduct.

## CONCLUSION

### Order

Hartford's exhibit L at page 58: 12-16 is stricken. Otherwise, I deny HTI's motions to strike. (#'s 162, 164). I deny Hartford's evidentiary objections.

### Findings and Recommendation

I recommend that the court:

(1) Find that Oregon Law Applies to HTI's tort claims;

(2) Grant judgment in favor of Hartford on HTI's Negligence and Breach of the Implied Covenant of Good Faith claims, however, should a jury find that the damages HTI suffered were a foreseeable result of a breach of the contract and that HTI suffered foreseeable harm as a consequence, those damages may be awarded under the contract claim;

(3) Grant judgment in favor of Hartford on HTI's Tortious Interference with Prospective Economic Advantage claim;

(4) Deny HTI's motion for judgment on its business interruption claim and grant Hartford's motion for a finding that the method for calculating a business income loss set forth by the policy is the sum of the net profit or loss and continuing operating expenses;

(5) Deny both parties' motions for judgment on HTI's extra expense claim;

(6) Dismiss Hartford's First, Second, Sixth, Seventh, Eighth, Ninth, Tenth and Twelfth affirmative defenses;

(7) Deny HTI's motion to dismiss Hartford's Third, Fourth, Fifth, Eleventh, and Thirteenth affirmative defenses; and

(8) Deny HTI's motion for summary judgment on Hartford's counterclaims for declaratory relief and breach of contract.

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due no later than fourteen days after the date this order is filed. The parties are advised that the failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991). If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, any party may file a response within fourteen days after the date the objections are filed. Review of the Findings and Recommendation will go under advisement when the response is due or filed, whichever date is earlier.

DATED this __24__ day of August 2011.

_____
THOMAS M. COFFIN
United States Magistrate Judge